HEARD NOVEMBER TERM, 1874.

The State of South Carolina *vs.* The Spartanburg and Union Railroad Company.

Where a railroad company issued bonds, with coupons for interest attached, which were guaranteed by the State, and, to secure the payment thereof, gave to the State a statutory lien on all the franchises, rights and property of the company, and the company afterwards failed to pay the coupons and became insolvent, and before the bonds became due the statutory lien or mortgage was foreclosed in an action by the State and all the franchises, rights and property of the company were sold: *Held*, That the holders of the coupons past due at the time of the sale were not entitled to priority of payment over the owners of the principal debt, which was not then due, but that such proceeds were distributable *pari passu* between the holders of the coupons past due and the owners of the bonds.

In the distribution of equitable assets, the general rule is to treat all debts as standing upon the footing of equality and to be paid *pari passu*.

Creditors called in to present and establish their claims in an action for the settlement of the affairs of an insolvent corporation have the same right of exception, appeal and objection to the report, orders and decrees in the case as creditors who were parties to the action by name.

In an action for the settlement of the affairs of an insolvent corporation, a creditor who has been called in under a general notice to creditors to present their claims, and who stands by and silently acquiesces in the orders and proceedings that are taken in the cause, will not afterwards be allowed to come in as a party defendant and file an answer contesting the validity of the proceedings that have been already had in the cause.

The actions referred to in § 290 of the Code of Procedure,—requiring issues of fact to be made up to be determined by a jury,—are such actions as before the adoption of the Code were recognized as actions at common law.

Where an agent made a written contract for his principal and also for himself in his individual right, purporting to be a contract under seal, and affixed the seal opposite his own signature: *Held*, That such seal might be regarded as the seal of the principal as well as of himself.

Vol viii—9

A contract by an agent, under seal, but which does not require a seal to make it valid, may be ratified by the principal by any writing, acts or words which would be sufficient to confirm a simple contract.

A contract by one assuming to act as an agent, but not authorized so to act: *Held,* To have been ratified by the subsequent acts, conduct and acquiescence of the principal.

Where exceptions are taken to the report of a Referee because of the omission of facts alleged to have been proved, the proper course is to move the Circuit Court to recommit the report on the exceptions thus taken.

Where a creditor fails to submit his claim within the time fixed by an order calling in creditors, he is not debarred from coming in and proving his claim as long as the fund remains under the control of the Court.

BEFORE MACKEY J., AT FAIRFIELD, FEBRUARY, 1874.

This was an action by the State of South Carolina, plaintiff, against the Spartanburg and Union Railroad Company, Rufus Y. McAden "and all other creditors of the same whose interest may require an answer to this complaint," defendants.

The summons and complaint were signed "D. H. Chamberlain, Attorney General of the State of South Carolina, plaintiff, J. M. Baxter, James H. Rion, William Munro, Robert W. Shand, attorneys of counsel," and were dated 23d September, 1871.

The complaint alleged :

I. That the said Spartanburg and Union Railroad Company are a corporation duly chartered under and by the laws of the State of South Carolina, and pursuant to an Act of the General Assembly of the said State entitled "An Act to authorize the formation of the Spartanburg and Union Railroad Company," passed on the 17th day of December, A. D. 1847, and the Acts amending the same.

II. That by an Act of the said General Assembly of the said State entitled "An Act to afford aid in completing the Spartanburg and Union Railroad," passed on the 21st day of December, A. D. 1857, it was enacted in words as follows: That whenever satisfactory evidence shall be given to the Comptroller General that all liens on the property of the Spartanburg and Union Railroad Company have been removed, he shall be authorized and required to endorse upon bonds of the said company to an amount not exceeding one hundred and fifty thousand dollars the guarantee of the State of South Carolina, thereby pledging the faith and funds of the State for the payment of the said bonds and the interest to accrue thereon, which bonds shall be payable at such place as the President of the company may designate, and shall bear interest not exceeding the rate of seven per centum per annum, payable

semi-annually, and shall not have more than twenty years to run: *Provided,* That none of the bonds so endorsed, as aforesaid, shall be sold by the company or used for the purpose of paying or satisfying any debt due and owing by them at less than their par value; and in case such bonds, or any of them, should be sold or used, as aforesaid, at less than their par value, the endorsement hereinbefore provided for shall be absolutely null as to the bonds so sold or used. And the Comptroller General shall also be authorized and required to endorse upon other bonds of the said company to an amount not exceeding sixty thousand dollars the like guarantee of the State, which said last mentioned bonds shall bear interest and be payable in like manner as the bonds first above mentioned, but shall not be subject to the proviso hereinbefore contained as to the said first mentioned bonds. And from and after the first day of January, which will be in the year one thousand eight hundred and fifty-nine, whenever satisfactory evidence shall have been produced to the Comptroller General that thirty miles of the Spartanburg and Union Railroad are finished and in working order, and that the rest of the said railroad had been graded, bridged, and in all respects made ready for the superstructure, the Comptroller General shall be authorized and required to endorse on other bonds of the said company to an amount not exceeding one hundred and forty thousand dollars the like guarantee of the State, which said last mentioned bonds shall bear interest and be payable in like manner as the bonds first above mentioned, but shall not be subject to the proviso hereinbefore contained as to the said first mentioned bonds.

That the said last mentioned bonds, to be endorsed, as aforesaid, after the first day of January, one thousand eight hundred and fifty-nine, shall not be used by the said company for any other purpose than for procuring the iron rails, chairs, spikes and equipments for the said railroad and for putting down the same; and the said bonds shall not be endorsed unless upon a resolution of the President and Directors of the company, for the time being, pledging the said company that the same shall be used for the purpose of procuring the said iron rails, chairs, spikes and equipments, and for putting down the said rails, and for no other purpose.

That so soon as any of the said bonds hereinbefore mentioned shall have been endorsed, as aforesaid, and as they may thereafter be endorsed, they shall constitute a lien or a mortgage upon the whole of the said railroad, including the road bed, right of way,

grading, bridges, masonry and superstructure upon all the stock subscribed for in said company, and upon the chartered rights and privileges thereof, and upon said iron rails, chairs, spikes and equipments, when purchased and delivered; and the State of South Carolina, upon the endorsement of the said bonds, and by virtue thereof, shall be invested with the said lien or mortgage without any deed from the said company to secure the payment of the said bonds and the interest thereon by the said company as the same shall become due. And the said lien or mortgage, besides the stock, right of way, grading, bridges, masonry, superstructure, iron rails, spikes, chairs, equipments, chartered rights and privileges, shall include all the property owned by the said company as incident to or necessary for its business. And after the Comptroller General shall have endorsed any of the bonds of the said company, as hereinbefore provided for, it shall not be lawful for the said company to give or grant to any person or persons whomsoever, or to any corporation whatsoever, any lien, mortgage or encumbrance of any kind which shall have priority over or come in conflict with the lien of the State hereby secured; and every such lien, mortgage or encumbrance shall be null and void as against the said lien or mortgage of the State; and the said lien or mortgage of the State shall have priority over all other claims existing or to exist against the said company.

That the State expressly reserves the right to enact all such laws as may be deemed necessary to protect the interest of the State, and to secure it against any loss in consequence of the endorsements of bonds under the provisions of this Act, but in such manner as not to impair the just rights of the stockholders of the company.

III. That all said bonds were issued by said company, and that the Comptroller General, satisfactory evidence having been given him that all liens upon the property of the Spartanburg and Union Railroad Company had been removed, and that all the requirements of said Act had been complied with, endorsed upon said bonds the guarantee of the State of South Carolina, thereby pledging the faith and funds of said State for the payment of said bonds in the manner required by said Act.

IV. That in pursuance of the right reserved to the State, as hereinbefore set forth, to enact such laws as might be deemed necessary to protect the interest of the State and to secure it against any loss in consequence of the endorsement of bonds as aforesaid, the

General Assembly of the said State, by an Act entitled "An Act to protect the interest of the State whenever payment of interest now due remains unpaid on bonds issued by any railroad company, and whenever the guaranty of the State is endorsed," approved March the 7th, 1871, enacted in words as follows: That the Attorney General be, and is hereby, required and authorized to cause to be instituted immediately after the expiration of thirty days after the final passage of this Act, for, on behalf of, and in the name of this State, an action, suit or other legal proceeding in any Court of this State, or of the United States, against each railroad company which has heretofore issued bonds, upon which the guaranty of the State is endorsed, and on which interest is now due and unpaid, unless within thirty days after the final passage of this Act such railroad company or railroad companies shall fully pay and discharge such interest, for the purpose of enforcing the payment of all interest due on the bonds of such railroad company, and protecting and securing the State against loss or damage by reason of such guaranty; and to this end to enforce the rights of the State by virtue of the statutory or other liens or mortgages held by the State, or held to secure the payment of said bond or bonds on all or any of the property, assets or effects of such company or companies.

That if the property included in the statutory or other lien or mortgage held to secure the payment of the bond or bonds named in the first Section of this Act shall not realize enough upon any sale or sales of all the property, assets and effects under and in pursuance of any order, judgment or decree in such action, suit or proceeding, to pay the principal and interest of such bond or bonds, the deficiency shall be, and is hereby, made a debt of this State, and shall be and is made payable as such.

V. That a large amount of the interest coupons of said bonds are now due and unpaid, and were due before the passage of said Act, and were not paid within thirty days thereafter, and are now unpaid.

VI. That the defendant, Rufus Y. McAden, has obtained judgment in this Court upon certain of said past due coupons, said judgment being for the sum of twenty-nine thousand seven hundred and thirty-three and $\frac{71}{100}$ dollars, and entered on the 5th day of November, A. D. 1870, and threatens to enforce his judgment against the property of said company.

VII. That divers other creditors have obtained judgments for large amounts against the said company, some of said judgments being for past due coupons, any of which creditors may, at any time, proceed to enforce their judgments against the property of said company.

VIII. That the said company is indebted to divers other persons on past due coupons of the said bonds.

IX. That the said company is indebted to divers other persons for other causes of indebtedness incurred by the said company prior to the 5th day of May, A. D. 1865, the payment of which debts would be detrimental to the interest of the said State as guarantor of the bonds aforesaid.

X. That the said company is, however, indebted by obligation secured by mortgage upon two "road steamers" purchased prior to the 5th day of May, A. D. 1865, which obligation and mortgage were given to secure the payment of the purchase money of said steamers, and which obligation ought, in law and justice, to be paid.

XI. That the said company is indebted to divers other persons in amounts of no considerable magnitude for materials, repairs and operating expenses, which indebtedness has been incurred since the said 5th day of May, A. D. 1865, and ought, in justice, to be paid.

Wherefore, the plaintiff prays judgment against the defendants:

1st. That Rufus Y. McAden, and all other creditors of the said company who have recovered judgment against the same, be restrained by an order of this Court from enforcing their judgments against the property of the said company.

2d. That all other creditors of said company be restrained by an order of this Court from instituting suit against the said company, or, where they have already instituted suits, from further prosecuting the same.

3d. That all officers and agents of the said company be restrained by an order of this Court from paying any indebtedness incurred by the said company prior to the said 5th day of May, A. D. 1865, except the balance of the mortgage debts due for the said two road steamers; and be also restrained from paying any debts except those incurred for materials, repairs and operating expenses since the said 5th day of May, A. D. 1865, and from making any expenditures except such as are absolutely necessary for keeping the said railroad in running order and defraying the operating expenses thereof.

4th. That the Treasurer of the said company be required to account to such Special Referee or Referees as may be appointed by this Court for the surplus funds that may be in his hands on the 1st day of January, A. D. 1872.

5th. That all the property of the said company, and the chartered rights and privileges thereof, be sold to foreclose the aforesaid statutory lien and mortgage and bar the equity of redemption of all persons whomsoever, by such Special Referee or Referees as may be appointed by the Court, on Monday, the first day of January, A. D. 1872, at such place, and upon such terms, as may appear to this Court to be best calculated to protect the interest of the State, with a due regard to the rights of creditors and said company.

6th. That all the creditors of the said company be required to prove and establish their demands before the aforesaid Special Referee or Referees on or before a day to be named by this Court.

7th. That a suitable person or persons be appointed Special Referee or Referees to receive proofs of the demands of the creditors of the said company, make such sales as may be ordered, and perform such other duties as may be prescribed by this Court.

8th. That this Court will make such other and further orders in the premises as may be necessary to protect the interest of the State, preserve the rights of creditors and carry out the provisions of the aforesaid Act of the General Assembly, approved March 7, 1871.

On September 23d, 1871, the following order for injunction was made by His Honor Rutland, J.:

"For the causes stated in the annexed complaint, verified on oath:

"You, the President, Treasurer and agents of the Spartanburg and Union Railroad Company are commanded to refrain from paying any debts incurred by the said company prior to the 5th day of May, A. D. 1865, except the balance of the mortgage debt due for two road steamers, and also to refrain from paying any debts except those incurred for materials, repairs and operating expenses since the said 5th day of May, A. D. 1865, and from making any expenditures except such as are absolutely necessary for keeping the said railroad in repair and running order and defraying the operating expenses thereof.

"And you, Rufus Y. McAden, and all other creditors of the said company, are commanded to refrain from enforcing judgment against the property of the said company, from instituting suit against the said company, and from further prosecuting such suits in cases where the same have already been instituted."

On September 28th, 1871, the Spartanburg and Union Railroad Company filed an answer, stating "that they neither affirm or deny the allegations contained in said complaint, but are satisfied to submit the rights and interests of the corporation they herein represent to the judgment and protection of the Court."

The defendant, McAden, also filed an answer, in which he admitted "all and singular the allegations" of the complaint, and alleged that he, as an individual, has obtained a judgment against the defendant (company) for the sum of $29,733.11, with interest thereon from November 5, 1870, on a large number of past due coupons of the bonds of said company, secured by the guaranty of the plaintiff; and, also, as President of the First National Bank of Charlotte, N. C., has recovered a judgment against the same company for the sum of $27,666.97, bearing interest from November 5, 1870, on a large number of the like past due coupons, and that both of said judgments are still wholly due and unpaid.

That the defendant holds forty of the bonds of the said company, each for $1,000, and also ninety-seven bonds of said company, each for $500; and that he interposes no objection to the sale of the said property of said company as prayed for in the complaint.

This answer was verified on October 26, 1871, by James H. Rion, as attorney of the defendant.

On the 15th day of November, 1871, His Honor Judge Rutland made the following decree in the case:

The issues in this action having been brought on for trial before the Honorable James M. Rutland, Judge, without a jury, at a Circuit Court held in and for Fairfield County, at Fairfield Court House, on the 15th day of November, A. D. 1871, and the pleadings in the above entitled action having been read, on motion of Mr. Attorney General:

It is ordered that the order of injunction made on the 23d day of September, A. D. 1871, be continued and made perpetual.

It is further ordered that the whole of the Spartanburg and Union Railroad Company, including the road bed, right of way, grading, bridges, masonry and superstructure lying and situate in the Counties of Fairfield, Union and Spartanburg, all the stock subscribed for in the Spartanburg and Union Railroad Company, the chartered rights and privileges thereof, the iron rails, spikes, chairs and equipments, and all the property owned by said company as incident or necessary for its business, be sold by James M. Baxter and Thomas B. Jeter, as Special Referees, on Monday, the 1st day of January, A. D. 1872, or some convenient sale day thereafter, before the court house door at Unionville, between the hours of 11 o'clock A. M. and 3 o'clock P. M., at public outcry, to the highest bidder, after the usual notice by public advertisement in the Fairfield Herald, the Unionville Times, the Carolina Spartan, the Columbia Phœnix and the Columbia Union, upon the following terms, to wit: $25,000 to be paid in cash and the balance in three equal annual installments, with interest on said balance from the day of sale, the purchaser to give his bond with a mortgage of the property sold, to pay for all necessary papers and revenue stamps.

It is further ordered that if, upon such sale, the purchaser fail to immediately pay said sum of $25,000 in cash, the said Referees do proceed at once to resell the above mentioned property, which they shall do as often as may be necessary until the terms of sale are complied with.

It is further ordered that the stockholders of the said company and the defendants, creditors of the same, and all persons claiming under them, be bound and foreclosed of all right, title and interest and equity of redemption in the property so sold or any part thereof.

It is further ordered that all the creditors of the Spartanburg and Union Railroad Company be required, by public advertisement in the papers heretofore named, to prove and establish their demands against the said company before the said James M. Baxter and Thomas B. Jeter, as Special Referees as aforesaid, at the law office of James H. Rion, Esq., in Winnsboro, South Carolina, on the 26th, 27th, 28th, 29th and 30th days of December, A. D. 1871, and on the 23d, 24th, 25th, 26th, 27th and 28th days of January, A. D. 1872.

It is further ordered that the said James M. Baxter and Thomas B. Jeter be, and they hereby are, appointed Special Referees to

receive the proof and make the sale as aforesaid, and to perform such other duties as may be required of them as such Special Referees.

It is further ordered that the Treasurer of the said Spartanburg and Union Railroad Company do account to the said. Special Referees for whatever surplus fund that may be in his hands on the 1st day of January, A. D. 1870.

It is further ordered that said Special Referees do report upon the sale made by them and upon all the matters herein referred to them at the next term of Court.

It is further ordered that the said Referees, before entering upon the discharge of their duties, do give their several bonds to the State of South Carolina, each in the penal sum of $10,000, each bond to have two good sureties thereto, and to be conditioned for the faithful discharge of their duties as such Referees, said bonds to be approved by the Attorney General.

It is further ordered that it be referred to W. K. Bachman, Esq., as Special Referee, to inquire and report as to what would be a suitable fee to be paid to the Attorney General and to the attorneys of counsel on the part of the State as a compensation for their services herein, and also what would be a suitable fee to be paid to James M. Baxter, Esq., as a compensation for his services in the case of *Alexander G. Brown* vs. *The Spartanburg and Union Railroad Company*, in the Circuit Court of the United States for the District of South Carolina, by the discontinuance of which case this action has been furthered; and also what would be a suitable fee to be paid to Henry Buist, Esq., and John H. Evans, Esq., attorneys for the Spartanburg and Union Railroad Company, and to Wm. Munroe and Robert W. Shand, Esqs., attorneys for creditors of the said company, for their services in proceedings in the United States Court for involuntary bankruptcy against said company, by the discontinuance of which proceedings this action has been furthered, and that said Referee have leave to make his report thereon to a Judge of this Court at chambers.

It is further ordered that said cash payment of $25,000 be applied to the payment of the costs of these proceedings and the expenses of said sale, then to the payment of such fees as may be ordered, and that the balance be deposited in the national banks of Spartanburg, subject to the further order of this Court.

On May 9th, 1873, the following order was made by His Honor Judge Mackey:

On motion of Mr. Rion, of counsel for the plaintiff, it is ordered :

1. That the Special Referees, James M. Baxter and Thomas B. Jeter, have further time until the 1st day of October next to file their report in the above entitled action.

2. That the Special Referees do hold a reference, for the purposes heretofore indicated in former orders of reference passed herein, at Unionville, on the 19th and 20th days of June, A. D. 1873, and do hold a final reference at Winnsboro, for said purposes, on the 3d and 4th days of September, A. D. 1873; that said Referees do give notice of said references by publication, to be made in the Carolina New Era, the Unionville Times, the Yorkville Herald, the Columbia Carolinian and Columbia Union, once a week for three weeks, the first publication to be made without delay after the rising of this Court.

3. That on the said 1st day of October next the said Special Referees do file with the Clerk of this Court their report upon the bonds, coupons and other demands against the said Spartanburg and Union Railroad Company that have been proven before them; and that they do also report the order of priority in which said bonds, coupons and other demands shall be paid out of the assets and the proceeds of the sale of the property of said Spartanburg and Union Railroad Company.

4. That any bond, coupon or claim not proven before the closing of the final references herein ordered shall be held to be debarred from receiving any dividend out of the aforesaid assets and proceeds of sale.

On November 6th, 1873, the Referees, James M. Baxter and Thomas B. Jeter, submitted their report as follows:

The undersigned, Special Referees, beg leave to submit the following report in the above stated case:

That they have, as directed, held various references to ascertain the indebtedness of the defendant, the Spartanburg and Union Railroad Company, secured by liens upon the property heretofore sold under the order of this honorable Court in the above stated case, but from the difficulties in establishing one of the claims presented

the Referees found it impracticable to file their report on the first day of October, 1873, as directed by order dated 9th May, 1873.

In the following statement the amount of bonds, coupons and interest on coupons is separately exhibited, and interest is counted on coupons to the 10th January, 1872. It was necessary to fix some uniform period, and that time was found most convenient and fair.

No notice has been taken of any claims except for bonds guaranteed by the State, (Statutes at Large, Vol. XII, page 612,) the coupons of such bonds, the interest on the coupons and a judgment claiming a lien on the property mortgaged to the State by the Act of the Legislature referred to. The bonds were all sold at par except $100,000, which were sold for $95,000, whereby the railroad company was enabled to save, as was proved, the net amount of $20,000. So that the proviso contained in Section 1 of the said Act, making the endorsement by the Comptroller General null and void if any of the bonds referred to in said proviso should be sold for less than par, has been substantially complied with and no exception has been taken by the counsel representing the State; and, besides, the Referees cannot see how the proviso could prevail against the innocent holders of such bonds and coupons of the same, who could have had no notice of the price paid.

The First National Bank of Charlotte, Rufus Y. McAden and John Edmunds Brown had each obtained judgment against the Spartanburg and Union Railroad Company in the Court of Common Pleas for Fairfield County on the past due coupons of the guaranteed bonds, but as these judgments gave no liens on the mortgaged property the coupons were received and treated as if no judgments had been rendered.

The claim of Gertrude A. Barnaby, administratrix, No. 72, is for bonds guaranteed by the State, "lost or destroyed during the occupation of Columbia by the army of the United States under General Sherman in 1865," as the claimant sets forth in her affidavit, of which bonds the number of one is unknown, and the other four are numbered respectively 580, 428, 427, 2. These bonds were of the denomination of $500. By reference to claim No. 10, established by the First National Bank of Charlotte, N. C., it will be seen that four bonds, each of the denomination of $500, Nos. 580, 428, 427 and 2, form part of that claim and are certainly identical

with four of the bonds set up as lost bonds by the claimant Gertrude A. Barnaby.

From the direction of General Sherman's march, after leaving Columbia, and the significant fact that the four bonds, 580, 428, 427 and 2, are found again in the hands of the same claimant in juxtaposition, although in a large package of bonds, leaves the impression that the fifth bond, the bond whose number is unknown to Mrs. Barnaby, is also embraced in claim No. 10.

The Bank of Charlotte has produced full evidence of its claim, and the same, it is respectfully submitted, should be allowed without any inquiry in this proceeding as to how it acquired possession of the bonds, all of which are payable to bearer, and the claim of Gertrude A. Barnaby, both for bonds and coupons, should be disallowed without embarrassing this case, now much encumbered by the great number of parties and unadjusted interest. The claimant Gertrude A. Barnaby can pursue her missing bonds and coupons in the hands of the First National Bank of Charlotte, or elsewhere, as she may find them.

The question of priority of payment between the bonds and coupons has been raised and pressed by argument of counsel upon the consideration of the Referees.

Upon behalf of the bondholders it is insisted that the bonds, none of which fall due before 1879, must share *pro rata* with the coupons now past due in the fund arising from the sale of the mortgaged property. It will be borne in mind that no coupons have been considered except those past due on or before the 10th January, 1872. The Act creating the lien (Statutes, Vol. XII, page 612,) provides "that upon the endorsement of said bonds, and by virtue thereof, the State of South Carolina shall be invested with the said lien to secure the payment of said bonds and the interest thereon by the said company as they shall become due." And the Act (Statutes, Vol. XII, page 613,) under which this suit was brought provides for a suit "to enforce the payment of all interest due," making no mention of bonds then known not to be due. These Acts, though not declared in terms public Acts, are to be so construed, and their terms and provisions are notified to the world, and all parties claiming under said Acts are certainly bound thereby.

Both the Acts referred to go far to establish by express terms the right of the holders of coupons due at the time of foreclosure to

priority of payment over the holders of bonds not yet due. A different mode of payment would violate the Acts both in their terms and evident intention.

This construction is consistent with the authorities, both elementary and judicial, so far as the Referees have been able to ascertain. They have not been referred by the able and industrious counsel representing the bondholders to any case in which different debts were secured by the same mortgage, some not due at the time of foreclosure, and in which those not due at the foreclosure were admitted to a *pro rata* participation in the assets arising from the sale of the mortgaged property.

In some States a condition is engrafted on railroad bonds which makes the principal become due upon a failure on the part of the company to pay the accruing interest, and in such cases if the bonds and coupons are both secured by the same mortgage, as in this case, a foreclosure for payment of coupons must be also for the payment of the bonds as well, because both are due. Such was the state of facts in *Denham* vs. *Railroad Company*, (1 Wall., 258, 265, 268,) and the bonds and coupons were paid *pro rata*.

Suppose the bonds of the Spartanburg and Union Railroad Company were a very superior investment, because of a high rate of interest paid with regularity, and the company were anxious to pay off their bond debt in advance of its maturity,—could a bondholder be forced to accept payment thus prematurely offered? Certainly not, because thereby the contract would be violated. The coupon holder has right to insist that the contract between the company and bondholder be strictly adhered to when its variation would impair the contract between him and the company under the mortgage, which, as set forth in the Act, (Statutes, Vol. XII, page 612,) which Act is the mortgage, that bonds and coupons are to be paid as they become due.

The Referees on the question of priority of payment between the coupons and bonds find as matter of fact:

1. That in the foregoing statement of claims proved and established, no coupons not past due on or before the 10th January, 1872, are embraced, which date, by agreement, stands as the day of foreclosure.

2. That none of the bonds of the Spartanburg and Union Railroad Company, secured by the mortgage aforesaid, were due at the time of the foreclosure thereof, and are not due now. The Referees hold as a legal conclusion—

1. That the bonds not due cannot share *pro rata* with coupons past due in the assets arising from the sale of the mortgaged property, but that such coupons must be first paid therefrom.

2. That if the bonds not yet due are allowed to share *pro rata* with the coupons past due at the time of foreclosure, coupons since maturing, and to mature, must be included in such participation.

N. W. Woodfin and Thomas W. Patton, as executors of the last will and testament of James W. Patton, late of Asheville, North Carolina, presented, on their oaths, a claim in favor of the estate of their testator, the said James W. Patton, for $16,313.53, with interest thereon from the 14th day of January, 1859, (which interest should be counted, if the claim is allowed, until the 10th of January, 1872,) the balance of a judgment rendered, as is alleged, at Spartanburg Court House, in the Court of Common Pleas, for $23,104.79, in favor of the said James W. Patton, against the Spartanburg and Union Railroad Company, credited by $9,680 on the 14th January, 1859. The claimants introduced, by way of further proof, an exemplification of the case of *James W. Patton* vs. *The Spartanburg and Union Railroad Company*, certified to by the Clerk of the Court of Common Pleas for Spartanburg County, F. M. Trimmier, Esq.

The Referees would state that they feel sure of the entire correctness of the exemplification despite the very imperfect way in which the case has been exemplified. It is composed of fifteen attached but unlocked pages, with the impression of the official seal on the last page, and ten loose detached papers enclosed, one of which is the judgment. Accompanying the exemplification there is the original execution.

At the hearing on this branch of the case, to which considerable time was given, the exemplification was offered in evidence but was not examined by the Referees or by the counsel for either side, and there seemed to be no question as to rendition of the judgment in proper form, and that it is yet unsatisfied except by the payment hereinbefore stated.

Creditors under the mortgage join in resisting the claimant's right to any portion of the assets arising from the sale of the mortgaged property in satisfaction of the balance of this judgment, because, as they allege, the lien of the judgment has been released.

The credit of the company had gone down very low,—so low that further progress in the completion of the road, then imperfectly

finished to Shelton, twenty miles, was suspended. Creditors were suing, and, to prevent undue advantage to some creditors over others equally meritorious and more forbearing, John L. Young, President, on the —— day of ——, confessed judgment to Davis Goudelock, trustee, for all the creditors in the sum of $200,000, then supposed to be sufficient to cover all the debts of the company.

This judgment was confessed at Union Court House, as the Referees are impressed, before the judgment was rendered at Spartanburg Court House in favor of James W. Patton; but if this point should be material the Referees hope the record may be produced as promised by Mr. Rion. The Referees, however, do not deem the point of time important.

Other judgments had been obtained about that time.

The General Assembly had, on the 21st day of December, 1857, passed the Act "to afford aid in completing the Spartanburg and Union Railroad," and the company desired to render compliance with the conditions of that Act.

A meeting of creditors of the company was convened at Union Court House on the 14th January, 1858, to procure the release of all liens as required by the Act. John E. Patton attended that meeting and released for himself and also for his brother.

It may be proper to here remark that the claim for estate of James W. Patton is the only one by judgment rendered in this case.

If James W. Patton had done in person what his brother John E. did for him, the Referees have no hesitation in saying that this claim would be groundless.

No proof has been adduced to show that John E. Patton acted under any express authority from his brother, James W. Patton, but it was shown that their relations were very fraternal, and that they acted each for the other in their extensive contracts on the Spartanburg and Union Railroad; but if James W. Patton had died on the 15th day of January, 1858, it can hardly be contended that the release, signed as it was, would have waived the lien of James W. Patton as between him and the company. To make the release binding we must look to subsequent circumstances and subsequent acts. Soon others became parties to this transaction. At the time of the meeting of creditors James W. Patton was on a tour through Georgia, Alabama and Florida, but on his return, which was about one month after the meeting, John E. informed James W. of what

he had done touching the release. James W. objected. Proof was admitted of James W.'s objection without regard to whom made The Referees were fully impressed with the incompetency of the testimony but admitted it subject to objection. In the wide latitude allowed for the proof of James W.'s objections, none were proved. to have been made to any one beyond his brother John E., his family and his legal adviser, Mr. Woodfin. He made no objection to President Young when he explained the financial condition of the company, and spoke to James W. of the release, with all which he expressed himself satisfied and hoped the road would soon be completed to Asheville, and upon the credit of the company, restored by the endorsement of bonds produced by the release, he took and executed a large contract for the completion of the road, for which he was paid in whole, or in part, by the endorsed bonds. He made no objection, so far as has been shown, to the authorities of the State or company touching the release; made no assertion of his rights now claimed under his judgment by levy, or otherwise, accepted a credit of $9,680 paid in the very bonds at par, raised to par by the endorsement founded on the release now objected to. These bonds would have been worthless without the endorsement, and without the release that endorsement would not have been given.

After the meeting at Union, 14th January, 1858, President Young applied to the Comptroller General, and, as the sequel shows, satisfied that officer of the sufficiency of the release, and procured his promise to endorse the bonds. President Young then sent to New York, had the bonds lithographed and returned, when they were endorsed. The date on the bonds was adapted to meet the arrangements of the company, and, as shown, does not show the exact time of their execution, but they were certainly not ready for issue when John E. informed James W. of John E.'s action in the matter of the release. James W. then had time and opportunity to protest efficiently against the issue of the bonds with an endorsement procured by the release made in part by his brother on his behalf. He did not so protest, and even objected to none but his own family, his brother and legal adviser.

Attention is called to the Act before referred to, by which other parties in interest are introduced, to wit, the State and holders of bonds and coupons.

The first Section makes the Comptroller General the sole judge of the evidence showing a release of liens. His act in endorsing the bonds was publication to the world of his satisfaction with the evidence of release offered.

In the third Section we find: "The State of South Carolina, upon endorsement of said bonds, and by virtue thereof, shall be invested with the said lien * * * * to secure the payment of said bonds and the interest thereon by the said company as the same may become due."

The holders of bonds and coupons purchased for value with this Act in their hands, so that they are not merely purchased for valuable consideration without notice of prior encumbrance on the property mortgaged for their security, but with positive notice from the Legislature and her officer, the Comptroller General, that there were no prior liens. Suppose that in the release of the lien James W. Patton's judgment had been entirely overlooked, and he had acted precisely as he has done,—would he be allowed now to interfere with the vested rights of the holders of bonds and coupons? There can certainly be no fault attributed to the holders of the bonds and coupons; but has not James W. Patton, if he ever intended to assert his judgment, not been guilty of failure to speak when opportunity and duty alike required him to speak, and should not now his representatives be required to keep silence?

The Referees find, as conclusions of fact, that—

1st. James W. Patton obtained judgment against the Spartanburg and Union Railroad Company, at Spartanburg Court House, in the Court of Common Pleas for Spartanburg County, for $23,104.79, with interest from the 1st of April, 1857,

Credited by 11th January, 1859.......................... ........$ 9,680 00
Balance due 14th January, 1859............................... 16,313 53

with interest from 14th January, 1859, to 10th January, 1872, now amounting to $31,146.15.

2d. That John E. Patton signed release of lien for James W. Patton without his authority, but upon the supposition that James W. Patton would sanction such act; but James W. Patton objected to the action of John E. Patton in the premises, to him, to James W. Patton's family and his legal adviser, but expressed his satisfaction to John L. Young, President Spartanburg and Union Railroad Company, and made no objection to the Comptroller General; but that James W. Patton had ample time after notice in which to ex-

press his objection to John L. Young, President, and to protest to the Comptroller General against the action of John E. Patton in signing the release for James W. Patton before the bonds were issued and passed into the hands of innocent holders.

3d. That James W. Patton, by his conduct after notice of the action of his brother on his behalf touching said release, acquiesced in the release of his lien and approved thereof by profit and advantage therefrom.

The Referees find the following as conclusions of law:

1. That so far as the lien of the judgment aforesaid affects the property mortgaged by the Act of the Legislature, that lien is released until the bonds and coupons secured by the statutory mortgage are paid.

To the foregoing report the following exceptions were taken by the executors of James W. Patton, deceased:

1. Because the Referees report as a conclusion of law that the lien of the judgment of James W. Patton is released until the bonds and coupons secured by the statutory mortgage are paid. When, by such finding, they announce as a conclusion of law that which is wholly unsupported, to wit, that James W. Patton agreed not to discharge the judgment he had against the Spartanburg and Union Railroad Company, but only to waive the lien of the same in favor of the State.

In thus setting up a special agreement, concerning which there was no proof, that the judgment should not be satisfied, but the lien only thereof waived, when the waiver of such lien made the judgment valueless, and for such waiver there was no consideration alleged or proved to the said James W. Patton.

2. Because the only testimony upon which the Referees rest their conclusion that James W. Patton released the lien of his judgment is that of John L. Young.

When such testimony was, when introduced, incompetent, under the 415th Section, Chapter VII, of the Code of Procedure, and not made competent because of the necessity it produced to examine the executors of James W. Patton and other parties. When such testimony was, moreover, incompetent, because it was produced to validate by parol the execution of a sealed instrument, for the signing and sealing of which there was admitted to have

been no authority given by the party who was affected by the same; and because the testimony so produced was, as it is reported, general in its character, without special details, and, if it could mean anything, was produced as meaning that James W. Patton had assented to the discharge of his judgment, not to any special waiver of its lien.

3. Because the Referees, while they declare themselves " fully impressed with the incompetency of the testimony " offered to show that James W. Patton never did at any time, or to any person, speak otherwise of the signing and sealing of the release by his brother, John E. Patton, than as wholly unauthorized by him, accept for the basis of their conclusion as to the discharge of this judgment a casual conversation between James W. Patton and Mr. Young, the President of this corporation, making the reported declarations of James W. Patton at that time outweigh the consistent and connected and continued declarations of James W. Patton in opposition to what Mr. Young recollects to have passed between them.

4. Because when the Referees report that James W. Patton " made no assertion of his rights now claimed under his said judgment," and add to this " by levy or otherwise," they assume in such statement that a judgment creditor must do some act in addition to the judgment, as it appears unsatisfied, that the lien it has ceased to exist or be of force.

5. Because to all that part of the report of the Referees which relies upon the alleged want of notice to the Comptroller General of the State that he claimed the lien of his judgment, the executors of James W. Patton respectfully submit that no obligation rested on the said James W. Patton to give such notice, because the fact that the judgment, being matter of record, was unsatisfied, of itself was the fullest notice to the Comptroller General; while' as to Mr. Young, President of the company, the testimony was positive and not contradicted that John E. Patton, when he was induced to sign the release for James W. Patton, plainly and positively stated to Mr. Young that he was not authorized to do so by his brother, James W. Patton.

6. Because the Referees have not reported, as one of the circumstances presented to them in proof, that James W. Patton did not release, nor signify to any one his purpose or intention to release, the lien of his judgment, this, that when he endorsed on his execu-

tion the credit for $5,000, he styled himself, in the receipt he gave to the Spartanburg and Union Railroad Company, as a purchaser of the bonds he received; in that clearly distinguishing between the bonds and the credit he was willing to endorse on the execution.

7. Because the proposition set forth in the report, and which implies that it was the duty of James W. Patton "to protest efficiently against an issue of bonds procured by the release in part by his brother in his behalf," composes and compounds the duty of James W. Patton, who had no right to interfere with whatever passed between the Comptroller General and the Spartanburg and Union Railroad Company—with that of the President of the road and of the Comptroller General. And if the Comptroller General was content to be less satisfied than he should have been with the proof of the release of liens, that cannot affect the right of one who holds a lien, and of which he cannot be divested, because of want of proper care on the part of a public officer in satisfying himself as to whether it is of force or not.

8. Because the Referees make the following admission in their report: "If James W. Patton had died on the 15th January, 1858, it can hardly be contended that the release, signed as it was, would have waived the lien of James W. Patton as between him and the company; "and which necessarily involves the admission that the act done by John E. Patton had no binding force or legal obligation so far as James W. Patton was concerned. And, with such an admission, and with cumulative proof before them that James W. Patton never expressed to any one his purpose to ratify the act of his brother, upon the recollection of Mr. Young as to a conversation he had with James W. Patton, and which conversation Mr. Young nowhere says had any effect upon him in concluding his arrangement with the Comptroller General; when, indeed, it may be fairly inferred that if Mr. Young had not met James W. Patton the arrangement with the State would have been concluded, (as well it might, for it was to the interest of the company to settle the claim of James W. Patton, if otherwise the endorsement of the State could not be obtained,) and so, upon this proof, the Referees recommend the discharge of a matter of record.

9. Because the Referees submit as an equity, to the benefit of which the holders of their bonds are entitled, that they are pur-

chasers, for value, of these bonds, without notice of prior encumbrances, when such holders have no specific or general lien whatever on the property of the Spartanburg and Union Railroad Company; none which they can enforce; but are simply the creditors of the State and of the said railroad company, without power or right on their part to assert any special claim on the property of the said company. And that the question in the case is, whether the State can claim the extinguishment of a lien in the hands of a *bona fide* creditor of the said company, because the officer of the State has accepted, as matter of fact, that a lien has been extinguished when it was not.

10. Because, if all possible effect is given to Mr. Young's recollection of the conversation between himself and John E. Patton, it cannot discharge, if it did ratify, the act of John E. Patton; and John E. Patton testifies, and is not therein contradicted, that the inducement held out to him was that, if he signed the release, James W. Patton would be paid in full the amount of his judgment. And if a release was so obtained by him, and the judgment itself remained unsatisfied, and so unsatisfied notice to the world that it was a lien and unpaid, no equity can arise either to the State or to any creditor of the Spartanburg and Union Railroad Company to override the legal right of James W. Patton.

11. Because the testimony does not support the conclusions of facts reported by the Referees; and in their conclusions of law there is manifest error.

12. Because the Referees omitted to include in their findings the fact, proved by J. L. Young, that William Kelly, and perhaps other creditors, did not sign the release.

13. Because the Referees omitted to include in their findings the fact that all the signatures to the release of liens were not proved.

14. Because the Referees omitted to include in their findings the facts that said release was signed by several administrators representing estates, by persons representing themselves as attorneys at law for creditors, and by J. H. Dogan reserving his right "as a preferred creditor in the judgment to D. Goudelock, trustee."

15. Because the Referees omitted to include in their findings the fact, proved by J. L. Young, that the conversation which he first had with J. W. Patton, after the release was signed, in which it was spoken of, was after it had been deposited in the Comptroller General's office, and during the Spring of 1858, and before the 7th June, 1858.

16. Because the Referees omitted to include in their findings the fact, proved by J. L. Young, that the whole $350,000 of bonds were endorsed on the 30th January, 1858.

17. Because the Referees omitted to include in their findings the fact, proved by an exemplification from Comptroller's office, that a statement of the judgment of *J. W. Patton* vs. *Spartanburg and Union Railroad Company*, with a certificate of the Clerk of the Court for Spartanburg County, dated 4th February, 1858, attached, in which he certifies to the correctness of said statement, and that said judgment still stands open upon the records, was deposited in the Comptroller's office.

18. Because the Referees omitted to include in their findings the fact, proved by J. E. Patton, that he told J. W. Patton, at the time he informed him of having signed the release for him, that the company had promised to pay him off in endorsed bonds very soon, and that he did not know the fact himself, and therefore did not tell J. W. Patton that by said release he was to be paid in *three* installments, and partly in other *assets*, and that J. W. Patton never did know that the release required him to be paid in *three* installments, and was not informed that he was expected to take part of his judgment in other assets until months after he received the $5,000 in bonds, in June, 1858.

19. Because the Referees omitted to include in their findings the fact that the State had endorsed the bonds over four months (30th January, 1858,) before J. W. Patton received any of them, (7th June, 1858,) and some time before he could have heard of the release by J. E. Patton.

20. Because the Referees omitted to include in their findings the fact, proved by certificate of John Dewberry, Sheriff, that J. W. Patton receipted for and took the *fi. fa.* in the case of *J. W. Patton* vs. *Spartanburg and Union Railroad Company* out of the Sheriff's office on February 2, 1860.

21. Because the Referees erred in reporting that the whole credit of $9,680 placed by J. W. Patton upon his execution against the Spartanburg and Union Railroad Company was paid in endorsed bonds of the company, when the fact is, as proved, that only $5,000 was paid in endorsed bonds, *purchased*, as the receipt states, from the company, and $4,680 was paid in amounts over paid to J. E. Patton & Co., for which over payment J. W. Patton gave his individual receipt and credited same on his judgment.

22. Because the Referees erred in reporting, as a fact proved, that J. W. Patton acquiesced in the release of his lien by his brother, by receiving profit and advantage from the endorsement of the bonds of the company by the State, when the fact is that his debt was in a much more secure condition with his judgment lien than with the endorsement of the company's bonds.

23. Because the Referees erred in holding, as between the present bondholders and the lien of J. W. Patton's judgment, that the bond-holders were entitled to be subrogated to the rights of the State under the statutory mortgage and to have a prior lien under it, because it is alleged they took said bonds on the supposition that J. W. Patton's lien had been released, when the fact is they took said bonds entirely on the faith of the endorsement by the State, as is shown by the fact, proved by J. L. Young, that the said bonds would not have sold for one cent without the State's endorsement, and the Referees *report* them worthless without it.

24. Because the Referees erred in holding that the present owners of the endorsed bonds are *bona fide* purchasers, (within the rule,) for valuable consideration without notice, when there is not a tittle of evidence as to the consideration paid (if any) by them for said bonds or that they did not have notice of J. W. Patton's judgment; on the contrary, the record of the judgment was notice to them.

25. Because the Referees should have held, as a matter of law, that the purchaser of a chose in action is not within the rule which protects purchasers of real estate for a valuable consideration, and that, therefore, the purchasers of the endorsed bonds in this case are not protected by the rule, even if it were proven that they had paid value for them, and that they are not entitled to set up said purchase as a bar to the lien of J. W. Patton's judgment.

26. Because the Referees erred in reporting that the sale of one hundred thousand dollars worth of bonds at ninety-five thousand dollars was a compliance with that part of the Act authorizing the endorsement of the bonds by the State, which required that they should be sold at par, and if not so sold that the endorsement of the State should be null and void.

27. Because the Referees should have held (it having been proved that part of the bonds were issued at less than par, in violation of the Act,) that it devolved upon each bondholder to prove that the bonds presented by him were issued at par, and, this not having been proved, that the liability of the State, as endorser, is released,

and the statutory mortgage, intended alone to secure the State against any loss, rendered thereby null and void.

28. Because the Referees erred in holding that J. W. Patton could ratify the release signed by J. E. Patton, which was under seal, by parol or in any other way than by an instrument under *seal.*

29. Because the judgment of J. W. Patton having been established as still subsisting and unpaid, the question to be determined, and which the Referees should have determined in favor of the executors of J. W. Patton, is whether this Court will allow the release of the lien of said judgment, signed by J. E. Patton, to be set up and specifically enforced, without first requiring the Spartanburg and Union Railroad Company to perform their part of such release, which was to pay said judgment by the 1st day of February, 1858.

30. Because the Referees do not report upon all the available assets of the Spartanburg and Union Railroad Company as required by the order of reference.

On February 13, 1874, His Honor Judge Mackey filed the following decree:

The issues in this cause came before me for trial, without a jury, at the November Term of the Court of Common Pleas for Fairfield County, upon the report of the Special Referees appointed therein, and exceptions filed to said report by the attorney for Thomas Branch & Co., and the attorney for the executors of the will of James W. Patton, deceased. Arguments were heard on several of the issues at said term, when, on motion of the attorney for the said executors, the argument on the remaining issues involved was postponed to divers other days, to which the Court was adjourned, until, upon the 23d day of December, the cause came up for a final hearing. After certain preliminary motions had been disposed of, it was ordered, by the expressed consent of the attorney for the executors of Patton, and of Mr. J. H. Rion, representing the State (by authority of the Attorney General) and sundry creditors, that the cause should be decided by me on written or printed arguments, to be presented on or before the first day of February, 1874. By request of the attorneys for the said executors, I have delayed the decision of the cause thus far beyond the time specified awaiting

the receipt of their arguments, which, up to this date, they have failed to present. Considerations of justice will not permit me any longer to delay my decision, and I must, therefore, proceed to decide the cause upon a consideration of the argument already heard upon its several branches, the report of the Referees, and the exceptions filed by the executors of Patton.

.I am of the opinion that the report of the Referees, filed on the 11th day of November, A. D. 1873, should be approved, and the exceptions thereto overruled. After having carefully weighed the evidence, and duly considered all the points of law raised by the very able and voluminous arguments of the several learned solicitors representing the plaintiff and the defendants, I am satisfied that all the findings of the Referees, both of law and of fact, are correct.

In my judgment the coupons past due on the day of foreclosure are entitled to a priority of payment over the bonds not yet due, neither the bonds nor the Act creating the statutory mortgage having any provision for the *pro rata* payment of past due coupons and unmatured bonds in the event of a foreclosure. In the event of a deficiency of assets to liquidate the bonds the bondholders must look to the State as the guarantor of the bonds.

As to the judgment of James W. Patton, I must hold that it has no lien upon any of the property of the Spartanburg and Union Railroad Company. Viewed in the light of the law and the evidence, the paper signed by John E. Patton, as attorney for his brother, James W. Patton, was not a release but an agreement for the satisfaction and a waiver of the judgment as a *lien,* while the judgment *debt* should stand as a subsisting obligation against the company. The question, therefore, as to whether the signature of John E. Patton, as attorney, was under seal, or as to the legal effects of its not being under seal, is not material, for a seal was not necessary to the validity of such agreement, there having been a good and valuable consideration therefor, of which consideration James W. Patton, in his lifetime, received a part in the bonds of the company, which bonds were endorsed in such a manner as to inform him that the lien of his judgment was regarded as released. Hence, James W. Patton must be held to have ratified the alleged unauthorized act of his brother, and to be estopped, by such ratification, from denying the validity of the State guaranty upon the bonds, some of which he received and disposed of to other parties for value, which bonds are now presented and proved by *bona fide* holders.

Indeed, the facts, proved incontestably before the Referees, show that it would be in the highest degree subversive of equity and violative of law to permit the executors of Patton now to assert the judgment as a valid lien. It is proper for me to observe that the very capable Referees, whose report is hereby approved, were nominated by the attorneys in the case—the State designating one and the creditors the other—and, after having been so nominated, they were appointed by the Court, and have acted for more than two years.

I deem it highly proper and desirable that I should state, *in extenso*, the reasons and authorities that have guided my judgment in the determination of this cause. In reference to its major branch—the status of the holders of the past due coupons and the bondholders in relation to the assets—there is no authority known to me directly in point, the cause being, in this particular primal, with no antecedent decision to furnish an index to its true solution. My judgment, therefore, upon that branch rests upon ascertained legal principles, unfortified by any adjudicated case, presenting the identical question at issue, the application of such principles being made with due regard to the maxim *"principia datasequuntur concomitantia."* I am, however, debarred by the delay already incident to the case, and the presentation of the arguments therein, and by the necessity of filing the decision within the period prescribed by the Constitution of the State, (Article IV, § 17,) from embodying in this opinion citations from the leading authorities, on which my conclusions of law are in the main founded, and hence I can make only a mere reference to them.— *Vide* Statutes at Large, Vol. XII, 612, 614; 1 Bouvier's Inst., 322, 323; *De Bruhl* vs. *Neuffer*, 1 Strob., 431; 2 Greenleaf on Evidence, 507, § 533; *The City* vs. *Lamson*, 9 Wall., 483; *City of Lexington* vs. *Butler*, 14 Wall., 297; *Dunham* vs. *Railroad Company*, 1 Wall., 258, 265, 268; 14 Stat., 613; 12 Stat., 612; *Laidner* vs. *Murray*, 2 Wall., 110; *Miller* vs. *Race*, Smith's Leading Cases, Vol. I, Part II, (7th American ed.); Story on Agency, (7th ed.,) 286, § 242; *Corbet* vs. *Lucas*, 4 McC., 331; *Wentzy* vs. *DeHaven*, 1 Sargt. & R., 312; *Whitehall* vs. *Wilson*, 3 Penn., 405; Chitty on Con., 775; *Hazard* vs. *Speers*, 43 N. Y., 469, 480, 483; *Bruce* vs. *Davenport*, 42 N. Y., 472; *Murray* vs. *Bininger*, 42 N. Y., 107; *Armstrong & Barnwell* vs. *Gilchrist*, 2 John's Cas., 424; Story on Agency, 297, § 255; Kerr on Fraud and Mistake, 127, *et seq.;* 2 Johnson, 573; *Coyle* vs. *City of Brooklyn*, 53 Barb.,

41; Story on Agency, 293, § 253; Bigelow on Estoppell, 475, 478, 497, 500, 501, 502, 509, 510, 511, 556; *vide* also *Mercer Co.* vs. *Hackett,* 1 Wall., 83; *Gelpeck* vs. *Dubuque, ibid,* 206; *Meyer* vs. *Muscatine, ibid,* 384.

For the reasons hereinbefore stated, I do adjudge and decree:

1. That the findings of law and of fact by the Special Referees in their report, filed on the 11th day of November, 1873, be confirmed, and that the same be made and declared the decree of this Court, and that all the exceptions thereto be overruled.

2. That the bonds and coupons reported by the said Referees in their said report, and also in their report filed on the 23d day of December, A. D. 1873, be adjudged as established, and that the same be paid, as far as may be, out of the proceeds of the property of the Spartanburg and Union Railroad Company sold under the proceedings heretofore had.

3. That out of the said proceeds of sale the coupons past due on the day of the sale of the mortgaged property be *first paid*, together with the interest thereon, calculated up to January 10th, 1872; and that the remainder of such proceeds be applied ratably to the payment of the bonds that have been proved.

4. That the claim of the executors of James W. Patton, deceased, be disallowed *as a lien*.

5. That the claim of Mrs. Gertrude Barnaby be disallowed.

6. That before the payment of any of the said coupons, interest thereon, or bonds, the Special Referees shall set aside a reasonable sum to provide for their just compensation and the expenses and costs of this cause; the sum so set aside and reserved not to exceed six thousand dollars, ($6,000,) and to be held subject to such orders as this Court may hereafter make in regard to the same.

Thomas Branch & Company, holders of bonds of the company which had been proved before the Referee and established by the report, and others in like interest with them, appealed from the foregoing decree, on the grounds that there was error in said decree in that it adjudged that the proceeds of the sale of the mortgaged property were applicable in the first place to the past due coupons and the interest thereon, whereas it should have adjudged that said proceeds were applicable ratably to the coupons past due on the day of sale with interest thereon to the day of sale and to the bonds of the company.

On October 29, 1873, the executors of James W. Patton filed a petition in the cause, wherein they claimed that the judgment of their testator against the Spartanburg and Union Railroad Company is a valid and subsisting lien on the property of the company and paramount to the mortgage held by the plaintiff, and prayed that the petitioners be made parties defendant in the cause with leave to file an answer and contest all the orders, decrees and other proceedings theretofore had in the said cause. An answer to this petition was put in by the Attorney General on behalf of the State, and on December 23, 1873, His Honor Judge Mackey made an order that the prayer of the petition be refused.

On February 27th, 1872, the Referee, William K. Bachman, submitted his report on counsel fees, wherein he recommended that fees, amounting in the aggregate to $15,500, be paid out of the proceeds of the sale, and on April 3d, 1872, the report was confirmed by His Honor Judge Thomas.

On the 15th day of December, 1873, W. R. A. Thomas and W. T. McJunkin, executors of William Kelly, deceased, filed a petition in the cause, wherein they alleged that on the 9th day of March, 1860, their testator recovered a judgment against the Spartanburg and Union Railroad Company for the sum of $1,521.28, and twenty-one dollars costs; that the said William Kelly was one of the creditors of the said railroad company for whose benefit the confession of judgment to David Goudelock, of date March 6, 1857, was made; that the said William Kelly never authorized satisfaction to be entered on the said judgment to Goudelock, and that the judgment of the said William Kelly against the said railroad company was still due and unpaid, and the petitioners prayed that they be allowed to come in and establish their claim under the orders theretofore made in the cause. This petition was heard by His Honor Judge Mackey, who, on December 23d, 1873, made an order that the prayer thereof be refused.

The executors of James W. Patton appealed from so much of the decree of His Honor Judge Mackey as disallowed the claim of the said executors to a lien under the judgment in favor of the said James W. Patton against the Spartanburg and Union Railroad Company, on the grounds:

1. The report of the Referees concerning the said judgment is not sustained by the evidence concerning matters of fact and is not sustained by law in questions of law.

2. That Judge Mackey has made a distinction between an agreement for the release by John E. Patton of the judgment of James W. Patton against the Spartanburg and Union Railroad Company—the said John E. Patton being, as is conceded, wholly unauthorized to make such agreement—and the release of the said judgment, when such agreement was wholly unauthorized, and the legal proposition is resolved into this: That a person wholly unauthorized may bind another to an agreement to release a lien while he could not execute the release himself because of the want of power given him for that purpose.

3. Because Judge Mackey has decided that a sufficient consideration is proved to sustain what he alleges was the agreement of John E. Patton, which, therefore, became binding on James W. Patton; and this consideration Judge Mackey doth further allege to be the bonds received by James W. Patton, when it was the proof before him that James W. Patton never acknowledged that he had received bonds in payment of his judgment, but, in the receipt held and produced by the President of the Spartanburg and Union Railroad Company, James W. Patton declares that he was the purchaser of the bonds, and when the uncontradicted testimony of John E. Patton is that the consideration which moved him was the promise that by his signing the release the claim of his brother, James W. Patton, would be paid in full,—a promise which has never been fulfilled; which it would appear could not have been fulfilled; and which, unperformed, could never have supported an agreement which rested upon it.

4. Because Judge Mackey has decided that as James W. Patton purchased certain bonds guaranteed by the State, and sold them to others, that he is estopped from asserting that the lien of his judgment is paramount and prior to the lien of the State. A proposition which involves the supposition that he, by such sale, the seller of such bonds, became the guarantor of the guaranty of the State; and that the mortgage to the State was a security belonging to each bondholder, and that, too, guaranteed by each seller of a bond to the purchaser of it, as a valid and paramount lien on the property of the Spartanburg and Union Railroad Company.

5. Because the decree of Judge Mackey is not supported by the proofs in the case, nor sustained by the law of the case, and should be reversed; and the judgment entered in the lifetime of James W. Patton against the Spartanburg and Union Railroad Company

be established as a subsisting lien on the property of the said road and prior to the statutory mortgage to the State.

They also appealed from the order of His Honor Judge Mackey of date December 23, 1873, refusing the prayer of their petition; and the executors of William Kelly also appealed from the order of the same date refusing the prayer of their petition.

*C. D. Melton, Magrath & Lowndes,* for Thomas Branch & Company, appellants.

*Jones & Jones, Magrath,* for executors of J. W. Patton, deceased, appellants.

*Steadman,* for the executors of William Kelly, appellant.

*Rion,* contra.

April 22, 1875. The opinion of the Court was delivered by

MOSES, C. J. The General Assembly, by Act of December 21st, 1857, (12 Stat., 612,) passed an Act by which it directed that its guaranty should be endorsed upon certain bonds of the Spartanburg and Union Railroad Company, and that "as soon as any of the said bonds shall have been endorsed, and as they may be endorsed, they shall constitute a lien or mortgage upon the whole of the said railroad," etc., and that "the State of South Carolina, upon the endorsement of the said bonds, and by virtue thereof, shall be invested with the said lien or mortgage without any deed from the said company to secure the payment of the said bonds and the interest thereon by the said company as the same shall become due."

The bonds were issued by the company, maturing in 1879, bearing interest at the rate of seven per centum per annum, payable semi-annually, and attached to them were coupons for the interest. The bonds were endorsed with the guaranty of the State, and on their face expressed that they were issued pursuant to the provisions of the said Act. By the fourth Section of it the State reserved its right to enact all such laws as may be deemed necessary to protect its interest and to secure it against loss in consequence of the said endorsement, but in such manner as not to impair the just rights of the stockholders of the company.

By Act approved March 7th, 1871, (14 Stat., 612,) the General Assembly "required and authorized the Attorney General, immediately after the expiration of thirty days after its final passage, for and on its behalf, and in its name, to cause suit or other legal proceedings against each railroad company which has heretofore issued bonds with its guaranty endorsed and on which interest is now due and unpaid, unless within thirty days from its passage such company shall fully pay such interest, for the purpose of enforcing all interest due on the bonds of such railroad company and protecting and securing the State against loss or damage by reason of said guaranty; and to this end to enforce the rights of the State, by virtue of the statutory or other lien or mortgage held by the State, or held to secure the payment of said bonds, on all or any of the property, assets and effects of such company or companies."

The third Section provides "that if the property included in the statutory or other lien or mortgage held to secure the payment of the bond or bonds named in the first Section of the Act shall not realize enough upon any sale or sales of all the property, assets and effects under any judgment or decree in such suit or proceeding to pay the principal and interest of such bond or bonds, the deficiency shall, and is hereby, made a debt of the State, and shall be and is made payable as such."

The Spartanburg and Union Railroad Company failed to pay the interest upon their bonds, and the action was commenced by the Attorney General under the said Act of 1871, in the name of the State, to protect the interests of the State, and to this end prayed a foreclosure of its statutory lien or mortgage. By an order in the cause the railroad and other property of the company were directed to be sold and the stockholders and creditors of the company and all persons claiming under them barred from and foreclosed of all right, title and equity of redemption. The property was sold and did not realize enough to meet the coupons past due proved before the Referees, much less the bonds also proved and established.

The Circuit Judge decreed that the coupons past due on the day of the sale of the mortgaged property be first paid, together with the interest thereon, calculated up to January 10th, 1872, out of the said proceeds of sale, and that the remainder of such proceeds be applied ratably to the payment of the bonds that have been proved.

Messrs. Thomas Branch & Co., and others in like interest, holders of bonds which they have proved, appeal from the decree, because: "It should have adjudged that the proceeds of the sale of the said mortgaged property, after deducting the costs and disbursements incident to the proceedings in the said case, be paid and applied ratably to the bonds and coupons past due on the day of said sale, together with interest on said coupons to the said day of sale."

The corporation is insolvent. Its whole property has been sold under a proceeding by the State to foreclose the statutory lien or mortgage which it held to secure it against the liability which it had assumed by the guaranty or endorsement of the bonds. The proceeds of the sale are in the custody of the Court, to be distributed among such of the creditors of the company as have an equity through the guaranty of the State to the benefit of the said mortgage.

The question first presented for the determination of the Court is, whether the holders of the coupons past due are entitled to the proceeds of the sale to the entire exclusion of the bondholders?

It must be so regarded and considered, for the whole fund is not sufficient to meet the coupons due proved on the reference. Before discussing the legal principles involved in the proposition submitted on the part of the respondents, it is proper to inquire whether it can be sustained, as they contend, by anything either in the Act of December 21, 1857, "to afford aid in completing the Spartanburg and Union Railroad," or that of March 7, 1871, "to protect the interest of the State whenever payment of any interest now due remains unpaid on bonds issued by any railroad company and whenever the guaranty of the State is endorsed." It is claimed that by the provisions of the first Act the mortgage "was to secure the payment of the bonds and the interest thereon by the company as the same shall become due." Such, however, would have been the effect of the mortgage without the superadded words. Suppose the language of the Act had merely been to secure the payment of the bonds,—would it not necessarily have been held to include the interest as well as the principal? And if the words "as the same shall become due" had been entirely omitted, would the right of the State to foreclose upon the non-payment of the interest when "it became due" have been in any way impaired or affected? The lien was the security for the guaranty of the bonds. They represented the

debt as a whole, for which the State was liable, and its express reservation of right "to enact all laws necessary to protect the interests of the State in consequence of its endorsement, but in such a manner as not to impair the just rights of the stockholders of the company," left it free to exercise its power of foreclosure on any default in the payment of the debt which it had guaranteed. The words imply no priority of payment in favor of any holder, either of the bonds or the coupons. The mortgage was to secure the whole debt endorsed by the State. The fund to be distributed is a common one, representing the property which was held not only to secure the interest but the principal of the bonds. The third Section of the Act provided that as soon as the guaranty of the State was endorsed on any of the bonds mentioned before, and as they may thereafter be endorsed, "they shall constitute a lien or mortgage upon the whole of the said railroad, including, &c." The subsequent words, "as they became due," were but a consequence resulting from the mortgage itself, which would have followed from the nature of the lien without any such expression. The construction of the respondents proceeds from a supposed distinction between the bonds and the interest, whereas the interest is as much included in a bond bearing interest as the principal itself.

The words have no meaning unless they refer to the right of foreclosure through the liability to forfeiture on the non-payment either of the interest or principal as it may fall due. Nor is there anything in the Act of 1871, under which this foreclosure was enforced, to sustain the right claimed by the respondents, even assuming that the State could by legislation subsequent to its contract, through its guaranty, change its relation to the bondholder. The Act of 1871 does not restrict the action which it contemplates to the mere collection of the interest due on the bonds, but resorts to it "to enforce the rights of the State by virtue of the statutory or other lien or mortgage held by the State, or held to secure the payment of said bond or bonds, on all the property, assets or effects of such company or companies." Section 3 looks to the event of a failure to realize on the sale of the property a sufficient amount to pay the principal and interest of the bonds, and by Section 4 a provision is made for such contingency. We fail to see in the terms of the contract which was created by the Act of 1857, or in that of 1871, which enforces the foreclosure, anything from which a right to priority of payment can be even inferred in favor of the holders

of the coupons past due. As was said in the argument, if the principle contended for can apply, then, "as between the coupons, if the fund is insufficient to pay all, those shall be preferred which first became due."

What is there in a coupon which by its mere form and designation can change its qualities as the representative or evidence of the interest to become due and payable on the bond? The Act of the Legislature was complied with by the Comptroller General when he endorsed on the bonds of the company the guaranty of the State for the payment, both of their principal and interest, "according to the stipulations on their face." The coupons were the issue of the company for their own convenience, and resorted to as an inducement to the more ready sale of their bonds in market from the negotiability and other properties of instruments of that character. The liability of the State was in no way affected by the form which the company might adopt to facilitate the collection and payment of the interest to be due upon its bonds, whether in the shape of a warrant or any other instrument denoting its intended purpose.

While coupons are recognized as *choses in action,* having many of the incidents of commercial paper, transferable, when payable to bearer, from hand to hand, and bearing interest, because payable on a given day, yet, though detached from the bond, in contemplation of law they still remain a part of it and are protected by and subject to the covenants which it contains. Mr. Justice Nelson, in the *City of Kenosha* vs. *Lawson*, (9 Wall., 483,) said: "The coupon is not an independent instrument like a promissory note for a sum of money, but is given for interest thereafter to become due upon the bond, which interest is parcel of the bond and partakes of its nature." To the same effect said Mr. Justice Clifford in *City of Lexington* vs. *Butler*, (14 Wall., 296).

The mode in which the fund in Court is to be distributed not depending, then, on the mere form of the coupon as distinguishing it from what it really represents, the interest accruing on the bond, it is necessary to ascertain the nature of the assets to which the holders of the coupons past due assert a prior claim. It by no means follows, because the Court of Equity holds in its custody assets to be distributed by its order, that they necessarily are of that equitable character to which its rule of "equality" must apply. Where, for instance, as is put by Mr. Spence, in the second volume of his treatise,

p. 421, lands were *assigned* in trust for the payment of debts, in the administration of the trust by the Court, judgments which affected land by their own strength and nature were directed to be paid according to their legal preference. But when the party has no lien which he can assert at law, and must resort to a Court of equity to obtain satisfaction of his demand out of assets in its control, the remedy he invokes is of that equitable character which binds him to all its requisitions and obligations.

"Equitable assets include all which are chargeable with the payment of debts or legacies in equity and which do not fall under the description of legal assets. They are called equitable assets, because, in obtaining payment out of them, they can only be reached by the aid and instrumentality of a Court of equity."—Story's Eq. Juris., § 552.

"Generally speaking, assets are equitable when, to obtain payment out of them, a creditor by bond or simple contract is obliged to go into a Court of equity."—Ram. on Assets, 317.

"The distinction between legal and equitable assets refers to the remedies of the creditor and not to the nature of the property."—See note to Adams Eq , 252.

The fund here to be distributed arises from a proceeding belonging exclusively to equity jurisdiction. The creditors who are contesting it would have had no *status* in a Court of law. The mortgage was held by the State and they were entitled to no relief through its foreclosure but by a resort to the equitable doctrine of subrogation, which entitles the creditor to the security which the guarantor took for his own protection. The State, the guarantor of all the bonds, delivers its security to the Court, and says: I hold this as a security for all the creditors interested in the debts of the Spartanburg and Union Railroad Company, created under the Act of 1857. Foreclose it and divide the proceeds among those for whose common benefit it was intended. What rule of law or principle of equity will prevent all who had a common interest from sharing in the common benefit? No case can be found where a different rule has been applied to creditors standing as those before us in relation to a fund of the nature of that now in contest. Suppose the bonds fell due at different periods and the mortgage had been executed by the company directly to the holders of them, and foreclosed in equity,—on what principle, when the lien was for the security of the whole debt represented by the bonds, could those

whose bonds had matured claim the proceeds of the sale to the exclusion of those whose bonds were not yet due? The security was for the protection of every bond and the interest which was to accrue on it.

The rule for the administration of equitable assets is well understood. Mr. Story, in his work on equity jurisdiction, Section 554, says: "Equitable assets shall be distributed equally and *pari passu* among all the creditors, without any reference to the priority or dignity of the debts; for Courts of equity regard all debts in conscience as equal *jure naturali*, and equally entitled to be paid; and here they follow their own favorite maxim, that equality is equity— *æquitas est quasi æqualitas.* And if the fund falls short, all the creditors are required to abate in proportion."

The respondents further insist that their claims are to be preferred because the interest of a debt is first payable, and that where a payment is made it must be so applied. We know no rule of law which requires or directs such preference. In the absence of any contract regulating the appropriation of partial payments, the creditor has a right to apply them at his pleasure where the debtor refrains from directions as to their disposition either by express words or by acts sufficient to denote his purpose, which may also be inferred from the attending circumstances. It is always a question of intention, to be determined by the conduct of the parties, and is the result of voluntary acts already performed. It cannot apply where the payment has not been appropriated and the manner in which the appropriation is to be made is to be determined by the Court. Mr. Justice Story, in delivering the opinion of the Court in *U. S.* vs. *Kirkpatrick*, (9 Wheat., 737,) says: "The general doctrine is, that the debtor has a right if he pleases to make the appropriation of payments; if he omits it, the creditor may make it; if both omit it, the law will apply the payments according to its own notion of justice. It is certainly too late for either party to claim a right to make an appropriation after the controversy has arisen."

Chancellor Johnson, in *Jones* vs. *Kilgore*, (2 Rich. Eq., 66,) says: "There is no doubt that if no directions are given by the party making the payment, the right to make the application is with the party receiving. If neither has fixed the application, it devolves upon the Court, and will be made *pro rata* to the demands made by him who receives the money against him who paid it; or, if one of the

demands be less secured than the others, the application will be made to it in the first instance." With how much greater reason does this mode of appropriation by the Court apply where the fund is the proceeds of a security which was taken for the common benefit of all who invested in the bonds, invited to do so by the provisions of the Act which gave the security, which could not have been rendered available but through the aid and instrumentality of the Court? Any other rule would be inconsistent with the principles of equity or the dictates of justice.

In *Stephens* vs. *Guernsey & Collier*, (9 Paige, 356,) where a question arose as to the right, under the banking law of New York, to a preference of payment out of funds in the hands of the Comptroller by the holders of protested notes of an insolvent bank over the other creditors, whose notes had not been protested, Chancellor Walworth, referring to certain decisions, said: "These, therefore, are merely referred to for the purpose of showing the strength of the principle that equality among persons having a common right to payment out of a fund provided for the benefit of all is equity, and the length to which Courts of justice have gone to sustain that principle and to give it its full effect. The principle, therefore, ought not to be departed from in this case without clear evidence of an intention to give one creditor a payment over another." And this language may well be applied to the case before us.

In our view, the proceeds of the sale must be distributed ratably between the bonds proved and the coupons due January 10, 1872, with interest thereon from said date, together with the coupons falling due after said day,—coupons of the latter class not, however, to bear such interest.

The executors of J. W. Patton appeal from the order of the Circuit Court of December 23, 1873, refusing the prayer of their petition, "that the plaintiff may be required to amend the complaint by making them parties defendants, with leave to answer and object to any orders made in the said cause, and that, in the meantime, no further proceedings be had in the cause." They found their application on the fact that before creditors were called in by any notice, orders were made affecting their rights, which they were thus prevented from resisting, and from which they should be allowed to appeal. It cannot be disputed that the order of November 15, 1871, was, in some respects, erroneous, and to the prejudice of the rights of the creditors, and yet one of the largest among them

was a party then before the Court and made no resistance. The order, too, covered matters on which no hasty action was necessary. Payment of the fees of the counsel should not have been ordered out of the proceeds of the sale; and much less those of counsel who had represented the company in other cases, having no connection with the one before the Court. The fees of the counsel of the plaintiff in the cause were chargeable to the plaintiff, and the counsel in the other cases stood but as the creditors of the company, with no right to preference or priority. The proceeding on the part of the State involved no difficulty. Its right to foreclose its lien or mortgage could not have been successfully resisted in any Court having proper jurisdiction of the subject matter. So, too, there was error in the appointment of the Referees. Conceding to the gentlemen selected the high character to which they are so well entitled, the one, the President of the company, a party to the cause, and the other, of counsel for the plaintiff, they were disqualified by their relation to it to act as Referees.

The executors of Patton, however, are now precluded from interposing any objection. Their position as creditors called in by the order of the Court gave them the same latitude of defense in every particular to which the creditor (one of the defendants on the record) was entitled. No right of exception appeal or objection in any form were they prevented from asserting; but it should have been exercised at the proper time. If they proposed to object, they should have filed a petition to the Court as soon as they had notice of the order, setting forth their claim, and asking, before they submitted it to the Referees, to be heard on their exceptions to such parts of the order as they desired to contest. Instead of this, they presented their claim to the Referees, offered testimony to establish it, cross-examined the witness who was introduced on the part of those who resisted it, and then, for the first time, asked that all proceedings should be stayed to allow them the opportunity of being heard by petition "as to their claim to be made parties to the cause without prejudice to their right to be heard in opposition to the orders already made in the cause." They should not have silently stood by and allowed the order of which they afterwards complained to be executed and the fund, out of which the payment of the fees referred to was to be made, to the extent of their amount, to pass beyond the control of the Court.

The report of the testimony is singularly defective as to dates. The time at which the publication was made or the claim presented does not appear, nor is a single day named on which a reference was held. There is no excuse for such omissions. We are at liberty, though, to infer, as the order required the creditors to establish their claims as early as December 26, 1871, that it was published before that day. The order confirming the report on fees and directing their payment was not made until April 3, 1872. The claimants here must have had full knowledge of it and should have excepted in time to have secured its suspension.

Without stopping to inquire whether the said claimants, if they had a right to a trial by jury, as they contend, have not lost it by the course they pursued, we will consider this ground of their appeal. It is a misconception to suppose that Section 290 of the Code of Procedure refers to an issue of the character of the one made on the claim of these creditors. It refers to the ordinary proceeding by "action on contract, (and with the assent of the Court in other actions,") where an issue of fact is to be made up to be determined between the parties by the finding of a jury. It includes actions such as before its adoption were recognized as actions at common law. The distinction is clearly made by the Code, which provides for "trial by Referees" as well as "by the Court," where the "trial by jury" is waived, in the mode pointed out by the said Section. It might be enough to say that the demand here was not on any contract sought by a plaintiff on the one hand against a contending defendant on the other. It was the case of a creditor standing in the relation of a defendant, claiming against his co-defendants a priority of payment out of a fund in Court through a lien on the property it represented.

A further and brief examination of other Sections of the Code will show that the mode pursued here has been in conformity with the long-settled course of the Court where assets were to be administered by it, and is in strict accord with the practice established by the Code. Section 276 directs that issues of fact in certain named actions must be tried by a jury, unless a jury trial is waived, as provided in Section 290, or a reference ordered, as provided in Sections 294, 295. "Every other issue (by Section 277) is triable by the Court, which, however, may order the whole issue, or any specific question of fact involved therein, to be tried by a jury, or may refer it, as provided in Sections 294, 295." The said Sec-

tion 294 allows "a reference of all or any of the issues of fact or law upon the written consent of the parties;" while Section 295 empowers the Court, "where the. parties do not consent, upon the application of either, or of its own motion, to direct a reference in the following cases," which it specifies;—and the character of the case before us brings it within the classes there named.

The said executors also claim that by virtue of a judgment recovered by their intestate against the company, and duly entered in the office of the Clerk .of the Court for Spartanburg in June, 1857, they are entitled to be paid the balance due upon it in preference to any of the holders of the bonds or coupons. The Referees, in their conclusions of fact, find that the judgment was so recovered, but that John E. Patton signed "a release of lien for J. W. Patton without his authority; but that after notice of the conduct of his brother, touching said release, he acquiesced in the release of his lien and approved thereof, by profit and advantage therefrom;" and find as a conclusion of law "that so far as the lien affected the property mortgaged by the Act of the Legislature, "it is released until the bonds and coupons secured by the statutory mortgage are paid." The Circuit Judge overruled the exceptions to the report so finding, and confirmed it. The executors appeal to this Court for a reversal of his order.

It is not our purpose in the judgment which we shall pronounce on this part of the case to notice separately each of the numerous grounds of exception on which the appellants rested in the Court below for the reversal of the findings of the Referees. Our conclusion will be reached by a consideration of the evidence as a whole, and the application of the legal principles which they involve. The declarations of the deceased to Mr. Young will be discarded, as we are not satisfied of his competency to testify to them.

The declarations to the family were clearly inadmissible; but as the counsel for the respondents, in their argument, seemed to waive any objection to them, they may be regarded as properly in evidence.

The instrument executed by John E. Patton was not a release of the judgment, (giving significance to the word in its technical sense,) though it is so called by the Referees. It was a satisfaction of the judgment, destroying its validity as a lien, but recognizing the debt on which it was founded as one for which the company was still liable, and making, on valuable consideration, a new contract

in regard to its payment, for which it substitutes another mode, and extended the time within which it was to be made. The judgment could have been enforced at once, and the plaintiff had a right to say that it should be discharged only by a legal tender. The contract changed this by the stipulations that the plaintiff would accept endorsed bonds and assets—the endorsed bonds having reference to those which had been guaranteed by the State. The seal affixed against his own name by J. E. Patton, we think, must be taken as that of the principal for whom he assumed to act. The place in which it appears is not conclusive of the design of the party in adding a seal. The execution of the instrument was on behalf of the principal, intended to bind him, and on its face it expressed that in witness of the agreement thus made by the parties to it they were "to set their hands and affix their seals." The L S after the name of J. E. Patton, who professed to act as attorney for J. W. Patton, must be accepted as the seal of the party on whose behalf he acted, and, whether it followed the name of the attorney or the principal, or preceded either, effect must be given to the act according to its apparent intention. J. E. Patton, in his individual right, was also a party to the instrument. On his own behalf he had already signed and sealed it, and placing the seal after his own name, when he undertook to represent another and sign for him, must be considered and taken as something done on behalf of such other which he conceived necessary to bind him.

The purpose to be accomplished by the instrument did not, however, require a seal, and could, therefore, be ratified by the principal by any writing, acts or words which would be sufficient to confirm a simple contract executed by an attorney.—See Story on Agency, § 49. If the purpose to be effected by the writing could only have been accomplished by a deed, then its execution by an agent must be ratified by the deed of the principal, if no previous power, by deed, authorized the act in his name. This was not a technical release which required a seal for its validity. Satisfaction of the judgment could have been acknowledged by a receipt, and would have been sufficient to the end in view; and a contract even by parol would have bound the company for the payment of the debts held by the testator against it according to the stipulations which may have been agreed upon between them.

We are obliged to accept the testimony as reported by the Referees. Although some exceptions were taken to its omission of

certain facts, averred to have been proved, and to error in the report of some of them, we have nothing before us by which it can be corrected. The proper course for the appellants was to have moved the Circuit Court to recommit the report on the exceptions thus taken, that they might have the opportunity of showing wherein they were prejudiced by its statement of the evidence. No such application was made and we are not at liberty to go outside of the report.

We do not think that the authority of J. E. Patton for executing the instrument of January 14, 1858, can be properly inferred from any of his previous acts in regard to the business of his brother. They related generally to his railroad contracts and money received on account of them. They are not of the nature of the one by which he is now sought to be charged. His liability to whatever obligation was imposed on him has arisen from his own acts. Mr. Woodfin, one of his executors, proves that the deceased had knowledge of the intention of the company to apply to the Legislature for the aid which it obtained, and from his testimony we must infer that his testator had *actual* knowledge of the passage of the Act. J. E. Patton swore that a month or more passed after the meeting at which he signed the paper before he saw his brother— informed him of his having signed and of his assurance that he would receive bonds. He thus had notice of some act by his brother in regard to his judgment—expressed no dissent and made no inquiry into the character of the agreement by which he had undertaken to bind him. Mrs. Henrietta K. Patton, another witness, goes further and testifies "that he heard of the release soon after its execution; he positively disapproved; said he would not have released himself; always said he would not abide by it." It is true that the recognition of the acts of an agent will not bind his principal unless made with a knowledge of the material facts in relation to it. But was it not the duty of J. W. Patton, on the notice of the release, to inquire into and ascertain the nature of the act, that he might know how and to what extent it affected his debt? Was it not due to the company that he should acquaint himself with its terms, so that, in the event of his dissent, it might not, in the meantime, be prejudiced by a performance on its part of any of the duties which it imposed on them? According to the report of the Referees, the bonds were not *issued* when J. E. Patton

informed his brother of his action. It was a gross neglect of his duty, both to the company and the Comptroller General, when he refrained, in a matter of so much interest to himself, from ascertaining the exact particulars of the act of his brother, that, if dissatisfied, the other parties to the contract might have early notice. In June, 1858, he accepted $5,000 of the said bonds in payment of his debt.

It is said that he purchased them. This could make no difference, for, if he did, the purchase money was at once allowed as a credit on his debt. But, according to the testimony of J. E. Patton, the deceased, in the Summer of 1858, had knowledge of the actual terms of the agreement and yet lived till December, 1861, without a word of protest or a single act done to remedy the wrong of which his executors now complain. In June, 1858, he had notice, through the bonds which he held, that the lien of his judgment was regarded as discharged; made no objection to it save to his own family and accepted a large railroad contract from the very company. How is this silence for so long a period to be explained except on the theory of his acquiescence in the act of his brother? With this array of testimony against the executors on a question of fact, to be governed and determined almost exclusively by intention, we find no evidence of sufficient weight to counteract the conclusions in which the Circuit Judge and the Referees both agree, and must yield to the effect which they give it.

The appeal of the executors of William Kelly must be sustained. While the fund is in Court, no creditor who has failed to submit his claim within the period fixed by the order is debarred from making it. Payment of the demands of creditors is not regulated by the time at which they may be severally presented, where the fund has not been appropriated and passed beyond the control of the jurisdiction which has power over its distribution.—*Shubrick* vs. *Shubrick*, 1 McC. Ch., 406; *Ex parte Hanks*, Dud. Eq., 231.

So much of the decree as directs (after provision for the compensation of the Referees and for the costs and expenses of the case) payment of the coupons past due on the day of sale, with the interest due thereon, out of the proceeds of the sale and applies the remainder ratably to the bonds proved, and also the order of 22d December, 1873, in regard to the claim of the executors of Kelly, are reversed. The motion on behalf of the executors of Patton is dismissed.

The case is remanded to the Circuit Court for the orders which may be necessary to give effect to the judgment of this Court according to the views herein set forth.

*Willard*, A. J., and *Wright*, A. J., concurred.